IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**NAVY SEAL 1**
c/o American Freedom Law Center
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20001

**NAVY SEAL 2**
c/o American Freedom Law Center
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20001

**NAVY SEAL 3**
c/o American Freedom Law Center
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20001

**NAVY SEAL 4**
c/o American Freedom Law Center
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20001

                    Plaintiffs,

    v.

**LLOYD AUSTIN**, in his official capacity as
Secretary of the United States Department of Defense,
1000 Defense Pentagon
Washington, D.C. 20301-1000

**CARLOS DEL TORO**, in his official capacity as
Secretary of the United States Navy
Office of the Secretary of the Navy
1000 Navy Pentagon, Room 4D652
Washington, D.C. 20350

**ADMIRAL MICHAEL M. GILDAY,** individually
and in his official capacity as Chief of Naval
Operations
Office of the Chief of Naval Operations
2000 Navy Pentagon
Washington, DC 20350-2000

                    Defendants.

Case: 1:22−cv−00688
Assigned To : Kollar−Kotelly, Colleen
Assign. Date : 3/11/2022
Description: Other Civil Rights (L−DECK)

**COMPLAINT**

"*Those who would give up essential liberty, to purchase a little temporary safety, deserve neither liberty nor safety*."

– Benjamin Franklin

Plaintiffs Navy SEALs 1 through 4 (collectively referred to as "Plaintiffs"), by and through undersigned counsel, bring this Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following upon information and belief:

## INTRODUCTION

1.      This is a civil action in which Plaintiffs seek to protect their fundamental rights guaranteed by the United States Constitution and federal statutory law.  Plaintiffs have taken a solemn oath to support and defend the United States Constitution against all enemies, foreign and domestic, and they have fulfilled this oath by risking their lives against hostile enemies, and they continue to fulfill this oath by filing this civil rights lawsuit, which seeks to support and defend fundamental rights.

2.      Plaintiffs seek a preliminary and permanent injunction enjoining the enforcement of the COVID-19 Vaccine Mandate and any and all adverse consequences Defendants have imposed, or intend to impose, upon Plaintiffs for objecting to the mandate on religious grounds, as set forth in this Complaint.  Plaintiffs seek a declaration that the challenged COVID-19 Vaccine Mandate violates their rights protected by the First and Fifth Amendments to the U.S. Constitution and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb to 2000bb-4, as set forth in this Complaint.  Plaintiffs also seek damages under RFRA against Admiral Gilday in his individual capacity as he is the final decision maker directly responsible for the harm caused to Plaintiffs.

## JURISDICTION AND VENUE

3.      This action in which the United States is a defendant arises under the Constitution and laws of the United States.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), and 1346.

4.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

5.      Plaintiffs' claims for damages are authorized by RFRA.

6.      Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e) because Defendants are located in this district and a substantial part of the acts giving rise to Plaintiffs' claims occurred in this district.

7.      This Court has authority to award Plaintiffs their reasonable costs and attorney's fees pursuant to 5 U.S.C. § 504, 28 U.S.C. § 1920, 28 U.S.C. § 2412, 42 U.S.C. § 2000bb-1, 42 U.S.C. § 1988, and the general legal and equitable powers of this Court.

## PARTIES

8.      Navy SEALs 1 through 4 are adult citizens of the United States, and they are currently serving on active duty in the U.S. Navy.[1]  Plaintiffs are currently subject to the challenged vaccine mandate ("Vaccine Mandate").

9.      Plaintiffs are members of the elite U.S. Navy Sea, Air, and Land Teams, commonly known as Navy SEALs.  SEALs are the U.S. Navy's primary special operations force, and they are a component of the Naval Special Warfare Command.

---

[1] Plaintiffs will be filing a motion to proceed pseudonymously.

10.     Navy SEALs 1 through 3 are currently serving as part of Naval Special Warfare Group 2, which is located in Virginia.  Navy SEALs 1 and 2 are assigned to the Training Detachment.  Navy SEAL 3 is assigned to Headquarters.  Navy SEAL 4 is serving as part of the Naval Special Warfare Development Group, which is also located in Virginia.

11.     Navy SEAL 1 has served as a Navy SEAL on active duty for 9 years.  Navy SEAL 2 has served as a Navy SEAL on active duty for 12 years.  Navy SEAL 3 has served on active duty in the U.S. Navy for over 29 years, serving 25 of those years as a Navy SEAL.  Navy SEAL 4 has served on active duty in the U.S. Navy for nearly 17 years, serving approximately 12 of those years as a Navy SEAL.

12.     As Navy SEALs, Plaintiffs have faced death and suffered many hardships defending our freedoms against enemies around the globe.  Plaintiffs are willing to make the ultimate sacrifice in defense of our freedoms enshrined in the Bill of Rights.  Plaintiffs must now file this federal lawsuit to defend *their* freedoms—freedoms which they too possess as American citizens.

13.     Because they are Navy SEALs, Plaintiffs are extraordinarily fit.  The physical demands of being a SEAL require Plaintiffs to be some of the most physically fit men in the country, if not the world.  Consequently, Plaintiffs belong to a demographic that is the least susceptible to suffering any adverse consequences from COVID-19.

14.     Plaintiffs are Christians.  Navy SEAL 1 is Catholic.

15.     Plaintiffs' sincerely held religious beliefs prevent them from receiving any of the current COVID-19 vaccines.

16.     Plaintiffs find no satisfaction in bringing this legal action.  They are exceedingly disappointed by the fact that their service to our nation and all that they have sacrificed, which

means so much to the American people, means so little to Defendants, the most senior government officials in Plaintiffs' chain of command.

17.     Defendant Lloyd Austin, in his official capacity as the Secretary of the United States Department of Defense ("DoD"), is responsible for enacting, implementing, and enforcing the challenged Vaccine Mandate under DoD authority.  Specifically, Secretary Austin issued the August 24 Memorandum for Senior Pentagon Leadership and other officials mandating that all military service members under Department of Defense authority receive a COVID-19 vaccine ("Vaccine Mandate").  Secretary Austin is sued in his official capacity.

18.     Defendant Carlos Del Toro, in his official capacity as the Secretary of the United States Navy, is responsible for enacting, implementing, and enforcing the Vaccine Mandate for all members of the United States Navy, including Plaintiffs.  Defendant Del Toro is sued in his official capacity.

19.     Defendant Admiral Michael M. Gilday, in his capacity as Chief of Naval Operations, is responsible for enacting, implementing, and enforcing the Vaccine Mandate for all members of the United States Navy, including Plaintiffs.  Defendant Gilday is sued in his individual capacity and in his official capacity.

## FACTUAL ALLEGATIONS

### A.     The Vaccine Mandate.

20.     Secretary of Defense Lloyd Austin announced on August 9, 2021, that COVID-19 vaccines would be added to the list of mandatory vaccines required for all service members "by no later than mid-September, or immediately upon [FDA] licensure, whichever comes first." Mem. for Dep't of Def. Employees (Aug. 9, 2021), https://perma.cc/H5G8-T62L.

21.     After the FDA announced its approval of Pfizer BioNTech's COVID-19 vaccine on August 23, 2021, Secretary Austin directed the "Secretaries of the Military Departments to immediately begin full vaccination of all members of the Armed Forces under DoD authority or on active duty or in the Ready Reserve, including the National Guard, who are not fully vaccinated against COVID-19."  Mem. for Senior Pentagon Leadership, Commanders of the Combatant Commands, Defense Agency and DoD Field Activity Directors (Aug. 24, 2021), https://perma.cc/CV3JEM3M ("Vaccine Mandate").

22.     Secretary Austin's directive indicates that "[m]andatory vaccination against COVID-19 will only use COVID-19 vaccines that receive full licensure from the [FDA] in accordance with FDA-approved labeling and guidance," but also notes that service members "voluntarily immunized with a COVID-19 vaccine under FDA Emergency Use Authorization" are considered fully vaccinated.  *Id*.  A subsequent directive issued by the Secretary of the Navy required all "[a]ctive duty Sailors and Marines" to "become fully vaccinated by November 28, 2021."

23.     Failure to abide by the Vaccine Mandate can and will result in harsh and severe penalties, including criminal prosecution, loss of pay and benefits, and separation from the armed services.

24.     Plaintiffs were advised by their chains of command via a page 13 entry in their service record that "[u]nless medically or administratively exempt, any refusal to be vaccinated may constitute a Failure to Obey a Lawful Order and may be punishable under the Uniform Code of Military Justice (UCMJ) and/or administrative action for Failure to Obey a Lawful Order (UCMJ, Article 92)."

25.     Plaintiffs were further advised via the page 13 entry of the following: "Additionally, per MANMED 15-105, special operations (SO) duty personnel (SEAL and SWCC) *who refuse to receive the COVID-19 vaccine based solely on* personal or *religious beliefs will be disqualified from SO duty* (unless the disqualification is separately waived by BUMED).   This will affect deployment and special pays.   *This provision does not pertain to medical contraindications or allergies to vaccine administration*."  (emphasis added).

26.     Consequently, because Plaintiffs, who are "special operations (SO) duty personnel," object to the Vaccine Mandate on religious grounds, they will face punitive measures for exercising their religion, regardless of whether they are granted a religious exemption to the mandate.  However, those with a secular, medical objection will not face similar punishment.

27.     The Vaccine Mandate is over-inclusive; it is a "one size-fits-all sledgehammer."

28.     Recent scientific studies conclude that natural immunity provides equivalent or greater protection against severe infection than immunity generated by COVID-19 vaccines.   In fact, natural immunity provides better protection to the more recent variants of COVID-19.   This is critical as the original (or wild) variant and the Delta variant, the most dangerous variants of COVID-19, are largely extinct.

29.     The COVID-19 vaccines do not prevent transmission of the disease among the vaccinated or mixed vaccinated/unvaccinated populations.

30.     The Delta variant of SARS-Cov-2 had previously accounted for 98.9% of the cases.  Because of the progressive mutation of the spike protein, the virus achieved an immune escape from COVID-19 vaccines.   Thus, the Delta variant was not adequately covered by the vaccines nor is the more recent Omicron variant.   In other words, even if you are/were fully vaccinated, you still could become infected with COVID-19.

31.     More recent studies demonstrate that natural immunity is at least as good as, if not better than, any immunities that one may receive from a COVID-19 vaccine.

**B.     Plaintiffs' Sincerely Held Religious Beliefs.**

32.     DOD INSTRUCTION 1300.17 "[e]stablishes DoD policy in furtherance of the Free Exercise Clause of the First Amendment to the Constitution of the United States, recognizing that Service members have the right to observe the tenets of their religion, or to observe no religion at all"; it "[e]stablishes DoD policy providing that an expression of sincerely held beliefs (conscience, moral principles, or religious beliefs) may not, in so far as practicable, be used as the basis of any adverse personnel action, discrimination, or denial of promotion, schooling, training, or assignment," and it "[i]mplements requirements in Section 2000bb-1 of Title 42, United States Code (U.S.C.), also known as 'The Religious Freedom Restoration Act' (RFRA), and other laws applicable to the accommodation of religious practices for DoD to provide, in accordance with the RFRA, that DoD Components will normally accommodate practices of a Service member based on a sincerely held religious belief."

33.     Navy SEALs 1 through 3 have sincerely held religious beliefs that preclude them from complying with the Vaccine Mandate because of the connections between the various COVID-19 vaccines and the cell lines of aborted fetuses, whether in the vaccines' origination, production, development, or testing.

34.     Navy SEAL 4's personal convictions, which are the basis for his religious objection to the Vaccine Mandate, are inspired by his study and understanding of the Bible and personally directed by the true and living God.  Accordingly, Navy SEAL 4 is personally convicted that he should not receive any of the COVID-19 vaccines.  He must comply with his convictions (James 4:17).  If he fails to submit to his personal convictions that the Holy Spirit and Scripture have

impressed upon him, then he will be sinning against God.  Thus, Navy SEAL 4's objection is based on his Christian faith and religious principle asserting a conscientious religious objection to the COVID-19 vaccines.

35.     All Plaintiffs have sincerely held religious beliefs that their bodies are temples of the Holy Spirit and that they cannot place anything into their temples without confirmation and conviction from the Holy Spirit.

36.     As Christians, Plaintiffs believe that it is more important to protect their souls, which will live for eternity, that it is to protect their physical bodies.  Consequently, the enforcement of the Vaccine Mandate favors secular objectives over religious objectives.

37.     Because of their sincerely held religious beliefs, Plaintiffs must conform their lives, including their decisions relating to medical care, to the commands and teachings of their faith.

38.     Navy SEALs 1 through 3 harbor a sincere religious belief that forbids them from receiving a vaccine developed using cell lines derived from an aborted fetus, a belief that bars each of these Plaintiffs from receiving any of the available COVID-19 vaccines.

39.     A fundamental component of the sincerely held religious beliefs of Navy SEALs 1 through 3 is that all life is sacred, from the moment of conception to natural death, and that abortion is the murder of an innocent life and a grave sin against God.

40.     The Church's position on abortion is very clear: "from the moment of Conception, the life of every human being is to be respected in an absolute way, therefore, no one can, under any circumstance, claim the right to directly destroy an innocent human being."  (Congregation for the Doctrine of the Faith, 1987).

41.     Scripture reveals that God knows us even before we are conceived.  *See* Jeremiah 1:4-5 ("The word of the Lord came to me, saying, 'Before I formed you in the womb, I knew you,

before you were born, I sanctified you; I ordained you as a prophet to the nations.'").  And God's

creative powers are effectively at work while we are still in the womb.  *See* Isaiah 49:1b ("The

Lord has called me from my mother's womb; From the bowels of my mother, he has made mention

of my name."); Psalm 139:13 –16 ("For you formed my inward parts; you covered me in my

mother's womb.  I will praise You, for I am fearfully and wonderfully made; Marvelous are your

works, and that my soul knows very well.  My frame was not hidden from You, when I was made

in the secret, and skillfully wrought in the lowest parts of the earth. Your eyes saw my substance,

being yet unformed; The days fashioned for me, when as yet there were none of them.").

     42.     Navy SEALs 1 through 3 have sincerely held religious beliefs that because life is

sacred from the moment of conception, the killing of that innocent life is the murder of an innocent

human in violation of God's commands.  *See* Exodus 20:13 ("You shall not murder."); Exodus

21:22–23  (imposing death penalty for killing of an unborn child); Exodus 23:7 ("[D]o do not kill

the innocent and righteous, for I will not acquit the wicked"); Genesis 9:6 ("'Whoever sheds the

blood of man, by man shall his blood be shed, for God made man in his own image.'");

Deuteronomy 27:25  ("Cursed be anyone who takes a bribe to shed innocent blood.")  (internal

quotation marks omitted); Proverbs 6:16–17 ("There are six things that the LORD hates, seven

that are an abomination to him: . . . hands that shed innocent blood . . . ."); Matthew 5:21b ("You

shall not murder, and whosoever murders will be in danger of judgment.").

     43.     Abortion is the modern-day sacrifice of children made in the image of God.

Plaintiffs do not want to be part of such an "abomination."  Based upon their sincerely held

religious beliefs, Navy SEALs 1 through 3 cannot, directly or indirectly, be associated in any way

with abortion.  To do so is abhorrent, loathsome, detestable, and abominable to God.  In short, to

require Navy SEALs 1 through 3 to inject a substance into their bodies that has any association

(no matter how near or remote) to abortion is a sin against their Creator, their Lord, and their Savior.

44.     The religious beliefs of Navy SEALs 1 through 3 compel them not to condone, support, justify, or benefit (directly or indirectly) from the taking of innocent human life via abortion, and that to do so is sinning against God.

45.     The Church has condemned abortion—the killing of human infants while in the womb—from earliest times.  The Didache, a conduct code of the early Christian community, dated by some as being as early as 70 A.D., is in accord with Scripture, stating: "[D]o not abort a foetus or kill a child that is born."  Loeb Edition of the Apostolic Fathers (also translated as "Thou shalt not murder a child by abortion nor kill that which is begotten.").  A Plea for Christians, written around A.D. 177 by Athenagoras, stated, "[W]e say that those women who use drugs to bring on abortion commit murder, and will have to give an account to God for the abortion."  Tertullian, in his Apologeticum, written in 197 A.D., wrote: "Murder being once for all forbidden, we [Christians] may not destroy even the fetus in the womb, . . ."

46.     It is the sincerely held religious belief of Navy SEALs 1 through 3 that abortion is murder, a violation of one of the Ten Commandments ("You shall not murder." Exodus 20:13), and it would violate their sincerely held religious beliefs to cooperate with or be complicit in abortion in any way, which includes receiving any of the currently available COVID-19 vaccines.

47.     The COVID-19 vaccines were developed or tested using cell lines that were generated or derived from tissues of aborted fetuses.  Johnson & Johnson used an aborted fetal cell line in manufacturing its COVID-19 vaccine, while Moderna and Pfizer used aborted fetal cell lines in testing the efficacy of their vaccines.  *See* James Lawler, MD, You asked, we answered: Do the COVID-19 vaccines contain aborted fetal cells?, Nebraska Medicine, August 4, 2021

(available at https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells).

48.     It is the sincerely held religious belief of Navy SEALs 1 through 3 that, by being vaccinated with any of the currently available COVID-19 vaccines, they would be cooperating with and complicit in abortion—the ending of an innocent human life—and that would constitute a sin against God and a violation of His Commandments, for which they would be held morally accountable.

49.     As noted previously, all Plaintiffs have a sincerely held religious belief that their bodies are temples of the Holy Spirit. *See* 1 Corinthians 6:15–20 ("Do you not know that your bodies are members of Christ? . . . Or do you not know that your body is a temple of the Holy Spirit within you, whom you have from God? You are not your own, for you were bought with a price. So glorify God in your body."). For Navy SEALs 1 through 3, to inject medical products that have any connection whatsoever to aborted fetal cell lines into their bodies would be defiling the temple of the Holy Spirit in violation of their sincerely held religious beliefs.

50.     Accordingly, because all of the currently available COVID-19 vaccines are developed and produced from, tested with, researched on, or otherwise connected with the aborted fetal cell lines, the sincerely held religious beliefs of Navy SEALs 1 through 3 compel them to abstain from obtaining or injecting any of these products into their bodies, regardless of the perceived benefit or rationale.

51.     Plaintiffs' faith teaches that they must obey their consciences in all matters. Forcing Plaintiffs to receive a COVID-19 vaccine or suffer adverse consequences, including, but not limited to, prosecution and criminal penalties, discharge from the military, removal from special warfare operations, adverse fitness reports, loss of pay and benefits, loss of education and

training opportunities, and loss of personal decorations and insignia, specifically including the Special Warfare / SEAL Trident insignia, places a substantial burden on Plaintiffs' exercise of their religion.

52.     Through much prayer and reflection, Plaintiffs' consciences confirm that accepting any of the currently available vaccines would be a sin.

**C.     Plaintiffs' Requests for Religious Exemption to Vaccine Mandate.**

53.     Each Plaintiff submitted a timely request for a religious exemption to the Vaccine Mandate pursuant to the established procedures.

54.     Navy SEAL 1 has yet to receive a response to his request for a religious exemption. However, to date, every request for a religious exemption made by a Navy SEAL has been denied by the reviewing authority utilizing the same boilerplate justification and language, and every appeal to the Chief of Naval Operations, Defendant Gilday (CNO), who is the final decision maker, has been denied, particularly for Navy SEALs.

55.     Thus, any appeal to the CNO is futile as the CNO has a policy and practice of issuing blanket denials of such appeals, particularly for Navy SEALs, and regardless of the outcome of the appeal, Navy SEAL 1 will still be punished for asserting a religious objection to the Vaccine Mandate, as set forth in this Complaint.

56.     On or about March 2, 2022, Navy Seal 2 received official notice that his request for a religious exemption was denied by the reviewing authority on February 6, 2022.  The February 6, 2022, denial letter contains the same boilerplate justification and language that Defendants have used to deny all of the religious exemption requests made by Navy personnel, particularly Navy SEALs.  On or about march 3, 2022, Navy Seal 2 submitted a timely appeal of his denial to the CNO.  As noted, this appeal is futile as the CNO has a policy and practice of making blanket

denials of such appeals, particularly for Navy SEALs, and regardless of the outcome of the appeal, Navy SEAL 2 will still be punished for asserting a religious objection to the Vaccine Mandate, as set forth in this Complaint.

57.     On or about November 30, 2021, Navy SEAL 3 received an email with an attached letter from the Deputy Chief of Naval Operations informing Navy SEAL 3 that his religious exemption was denied.   The letter was dated November 22, 2021, and it contains the same boilerplate justification and language that Defendants have used to deny all of the religious exemption requests made by Navy personnel, particularly Navy SEALs.

58.     Navy SEAL 3 timely submitted an appeal of his denial to the CNO.  However, as noted previously, this appeal is futile as the CNO has a policy and practice of issuing blanket denials of such appeals, particularly for Navy SEALs, and regardless of the outcome of the appeal, Navy SEAL 3 will still be punished for asserting a religious objection to the Vaccine Mandate, as set forth in this Complaint.

59.     Navy SEAL 4 made his request for a religious exemption to the Vaccine Mandate on or about October 15, 2021.  This request was denied by the reviewing authority on or about November 26, 2021, utilizing the same boilerplate justification and language used for all other such denials.  Navy SEAL 4 timely appealed this denial to the CNO, who denied the appeal on or about February 10, 2022, pursuant to the CNO's policy and practice of issuing blanket denials of such appeals, particularly for Navy SEALs.  Navy SEAL 4 is now being processed for discharge from the U.S. Navy.

60.     The     government     is     required     to     review     requests     for     religious accommodations/exemptions on a case-by case basis.  Yet, the U.S. Navy denial letters are boilerplate form letters that do not address the specific situations of each Navy SEAL.  Indeed, the

letters received by Navy SEALs 2, 3, and 4 were identical to the disapproval letters received by numerous sailors stationed at Plaintiffs' commands and at other commands. Each Plaintiff submitted distinct, personal accounts of their religious practices and the ways in which the Vaccine Mandate violates their sincerely held religious beliefs. The carbon copy disapproval letters demonstrate a "blanket disapproval" of religious accommodation requests regardless of factors articulated in the initial requests. Blanket disapprovals of religious accommodation requests violate military service members' religious liberties and the right to case-by-case consideration and review as specified in DOD INSTRUCTION 1300.17. Moreover, the Religious Freedom Restoration Act requires the government to demonstrate that the compelling interest test is satisfied through application of the challenged mandate "to the person"—the particular claimant whose sincere exercise of religion is being substantially burdened. Defendants have not, nor could they, satisfy that standard with regard to Plaintiffs.

61.     Plaintiffs face punishment as a result of their sincerely held religious beliefs.

**D.      Substantial Burden on Plaintiffs' Religious Exercise.**

62.     The punitive measures that Defendants will impose upon Plaintiffs for exercising their religion and objecting to the Vaccine Mandate on religious grounds include, but are not limited to, removal from special warfare operations, adverse fitness reports, loss of special duty pay and benefits, loss of education and training opportunities, and loss of personal decorations and insignia, specifically including the Special Warfare / SEAL Trident insignia.

63.     Because Plaintiffs are unvaccinated due to their sincerely held religious beliefs, they are currently being denied benefits, including tuition assistance, benevolence support such as Transition Assistance Programs, which include DOD SkillBridge and the Warrior Care Apprenticeship Program, among other support programs. Because Plaintiffs are unvaccinated due

to their sincerely held religious beliefs, they are not eligible for promotions, regular leave to visit family members, permanent change of station ("PCS") orders, nor are they eligible to attend any schools, among other punishments.   Denying Plaintiffs these benefits does not promote any legitimate government interest nor does it serve any legitimate government purpose.   Rather, Defendants' actions are punitive, and Defendants are taking these actions to punish Plaintiffs for exercising their religion.   The denial of these benefits substantially burdens Plaintiffs' religious exercise.

64.    The loss of the Trident insignia does not promote any legitimate government interest nor does it serve any legitimate government purpose.   Rather, this is a punitive measure being used to punish Plaintiffs for exercising their religion.   Plaintiffs endured much hardship, pain, and punishment to earn the Trident, and they wear this insignia with pride.   Forcing Plaintiffs to remove their Trident insignias because Plaintiffs object to the Vaccine Mandate on religious grounds will cause irreparable harm to Plaintiffs.   This punitive measure is purely retaliatory, it serves no legitimate government interest or purpose, and it substantially burdens Plaintiffs' religious exercise.

65.    Another punitive measure imposed by Defendants against Plaintiffs includes removing Plaintiffs from the ranks of the Navy SEALs and placing them in another fleet command. In other words, Defendants will force Plaintiffs to serve in close quarters alongside other Navy sailors deployed on a ship or at a shore station, but Defendants will not permit Plaintiffs to serve alongside their fellow SEALs.   This punitive measure is purely retaliatory, it serves no legitimate government interest or purpose, and it substantially burdens Plaintiffs' religious exercise.

E.     **No Compelling Governmental Interest.**

66.     The readiness and fitness of the military force is adversely affected by punishing Plaintiffs, separating Plaintiffs from their special warfare duties, and discharging Plaintiffs, particularly in light of the time, energy, and resources expended to locate, recruit, and train such highly skilled warfighters as Plaintiffs.

67.     It costs the Department of Defense approximately $500,000 to train one Navy SEAL, and that does not include the cost for all of the follow-on training that a Navy SEAL receives through the course of his career.  Consequently, the Department of Defense will lose more than $500,000 worth of training if they dismiss any one of the Plaintiffs in this action or if they prevent any Plaintiff from continuing to operate as a SEAL.  Moreover, the experience the Department of Defense will lose if they punish Plaintiffs is irreplaceable.

68.     Despite the Delta variant and Omicron variant outbreaks, the increasing likelihood of herd immunity to COVID-19, the low-risk for healthy young adults (such as Plaintiffs) of serious complications or death due to COVID-19, the negligible risk of asymptomatic spread of COVID-19, and the vastly improved COVID-19 treatments currently available all make the risks inherent in COVID-19 significantly lower than they were in 2020.

69.     COVID-19 vaccines are progressively losing efficacy over the prevention of COVID-19, and in widely vaccinated countries (Israel, Iceland, Singapore) up to 80% of COVID-19 cases have been previously vaccinated implying that the vaccines have become obsolete with antigenic escape or resistance to variants (*e.g.*, Delta and Omicron) that have evolved to infect persons who were vaccinated against the now extinct wild-type SARS-CoV-2 strain.

70.     It is not good research or clinical practice to widely utilize novel biologic therapy (mRNA, adenoviral DNA COVID-19 vaccines) in populations where there is no information

generated from the registrational trials with the FDA, specifically COVID-19 survivors or suspected COVID-19-recovered.

71.     The risks associated with the experimental COVID-19 vaccines far outweigh any theoretical benefits, are not minor or unserious, and many of those risks are unknown or have not been adequately quantified nor has the duration of their consequences been evaluated or calculated as it is not calculable at this time.

72.     The health risks of taking a COVID-19 vaccine are significantly greater than consequences from contracting the Omicron variant of COVID-19—a variant which has proven to be quite mild as compared to the now largely extinct original/wild variant and Delta variant.

73.     Mandatory administration of COVID-19 vaccines creates an unethical, unreasonable, clinically unjustified, unsafe, and unnecessary risk to Plaintiffs.

74.     According to the Centers for Disease Control ("CDC"), the COVID-19 vaccines are a "new approach to vaccines."  Per the CDC, "mRNA vaccines are a new type of vaccine to protect against infectious diseases.  To trigger an immune response, many vaccines put a weakened or inactivated germ into our bodies.  Not mRNA vaccines.  Instead, they teach our cells how to make a protein—or even just a piece of a protein—that triggers an immune response inside our bodies.  That immune response, which produces antibodies, is what protects us from getting infected if the real virus enters our bodies."

75.     The body of a person who has had COVID-19 and recovered has already "trigger[ed] an immune response . . . which produce[d] antibodies" to the virus, thereby "protect[ing the person] from getting infected [again]."  If the antibodies developed from having had COVID-19 do not protect the person, then the antibodies created by the vaccines are useless, particularly since natural immunities are better than those created by vaccines.  Pursuant to the

Vaccine Mandate, Defendants are discriminating against individuals with natural immunities in order to force service members to get a COVID-19 vaccine. This decision is driven by politics and not science.

76. Because the mRNA vaccines are new, their mid-term and long-term effects are unknown. Indeed, these effects could prove deadly or seriously debilitating, particularly to younger people, such as Plaintiffs, who will have the mRNA vaccine operating in their bodies for many decades.

77. Plaintiffs are not part of the demographic most susceptible to COVID-19 (the elderly and those with co-morbidities). Consequently, Defendants have no basis or interest in coercing them into getting a COVID-19 vaccine.

78. The mRNA shots (COVID vaccines) are experimental drugs for which we do not know the medium- and long-term consequences.

79. The vaccine mandate is over-inclusive; it is a "one size-fits-all sledgehammer." This oversimplified mandate ignores the true demographic science behind the real-world results of these experimental gene therapy vaccines. The real-world data and experience after the rush to administer this experimental gene therapy to millions of people overwhelmingly reveal that the vaccines are no longer safe or effective, nor do they mitigate the contraction or complications of COVID-19. There are also subgroups of the population which fit Plaintiffs' specific cases showing that the vaccines increase their (Plaintiffs') risks significantly while never reducing the risk of transmission to their fellow sailors.

80. Plaintiffs have natural immunity. Navy SEALs 2, 3, and 4 have already contracted COVID-19. As a result, they have active antibodies that have been proven to be more protective

to their personal health than the vaccines.  These antibodies also more effectively reduce the transmission of COVID-19 to their fellow sailors.

81.    Peer reviewed studies have shown that the fully vaccinated who contract the Delta variant have an 8.6-fold increased risk for death, (95% CI 5.73-12.91), p < 0.0001, as compared to those who chose to remain unvaccinated.  Thus, Plaintiffs' risk of death is significantly and unacceptably higher with following the challenged mandate than if they simply relied upon their natural immunity.

82.    Plaintiffs' natural immunity is more effective in preventing the spread to their fellow sailors as demonstrated in a Cleveland Clinic trial.  Cleveland Clinic studied their employees for the effects of natural immunity in unvaccinated people.  They found zero SARS-CoV-2 reinfections during a 5-month follow-up among n=1359 infected employees who were naturally immune and remained unvaccinated, concluding that such persons are "unlikely to benefit from COVID-19 vaccination."

83.    The COVID-19 vaccines are not safe.  These genetic vaccines (Pfizer, Moderna, Johnson & Johnson ["J & J"]) skipped testing for genotoxicity, mutagenicity, teratogenicity, and oncogenicity. In other words, it is unknown whether or not these products will change human genetic material, cause birth defects, reduce fertility, or cause cancer.  The Pfizer, Moderna, and J & J vaccines are considered "genetic vaccines," or vaccines produced from gene therapy molecular platforms, which, according to FDA regulatory guidance, are classified as gene delivery therapies and should be under a 15-year regulatory cycle with annual visits for safety evaluation by the research sponsors.

84.    Reports through the Vaccine Adverse Event Reporting System ("VAERS"), which collects data on a voluntary basis from health care providers and patients, show dramatic and

concerning outcomes.  The total number of adverse events in VAERS from the three COVID-19 gene therapy vaccines is 1,131,984 as of February 18, 2022, while all of the other vaccines combined since 1990 reported only 872,313.  In addition, the number of deaths from this gene therapy is 24,402 during this same period, while all the other vaccines combined from 1990 total 9,573.  Finally, the number of permanent disabilities caused by this experiment is 44,512, while all the combined vaccines have contributed to only 20,861 permanent disabilities.

85.    Plaintiffs' relative risk of adverse reaction from a COVID vaccine is 55 times greater than from a seasonal flu vaccine, and their risks of dying from a COVID vaccine is 168 times greater than from a seasonal flu vaccine.  Thus, publicly available, unbiased research shows that these experimental vaccines are not safe.  The failure of the CDC and FDA to recognize and address these concerns places everyone at needless risk.  The use of this experimental gene therapy with its lack of basic safety bench research into the risks of contracting cancers and autoimmune diseases is reminiscent of the government's use of agent orange.

86.    The available COVID-19 vaccines are not effective against current and future variants of COVID.  As of the week ending January 22, 2022, Omicron was estimated to account for 99.2% (95% CI = 99.0%–99.5%) of SARS-CoV-2 infections nationwide, and Delta accounted for 0.7% (95% CI = 0.5%–1.0%).  Each variant is the result of an immune escape mechanism built into the corona virus family.  The virus survives by escaping our current immune system and mutating away from the original or native form of the virus.  The three currently available COVID-19 gene therapy vaccines focused on the native spike protein production within our bodies to produce neutralizing antibodies effective only for the native form and perhaps the first couple of mutations.  As more and more humans either contract the virus or become fully immunized with the gene therapy, we reach herd immunity, and the virus has no choice but to mutate to survive.

87.     Most states reached herd immunity by mid-2021.   Therefore, any further immunizations are an exercise in futility to prevent further spread.   Because of progressive mutation of the spike protein, the virus has achieved an immune escape from the COVID-19 vaccines with the most obvious example being Israel where indiscriminate vaccination achieved 80% immunization rates.  A majority of hospitalized patients in Israel have been fully vaccinated, meaning that the three experimental gene therapy vaccines do not save hospital resources nor do they "flatten the curve."  The current effectiveness of COVID-19 Vaccines in Israel fell from 92% to 39%, thus supporting the mutation theory.

88.     This lower rate of effectiveness does not allow any known vaccine to slow the rate of spread and protect other sailors or coworkers from transmission.  Traditionally, a rule of thumb to determine if a vaccine can slow the transmission of progression requires vaccine effectiveness to rise above the 50% marker.  Without this rate of effectiveness, the vaccine does not slow the rate of transmission, and the recipients only receive the risk of the treatment with little to no benefit to society.

89.     Even if a vaccine could produce effectiveness that would save lives, one must also realize the superior effectiveness of natural immunity.  Once a virus infects an individual, and that individual produces an immune response, t memory cells allow the innate and adaptive immune system to re-recognize the virus on subsequent attempts of re-infection and thus protects the host from another infection.  This is true with most viral infections, yet the benefits of natural immunity have been totally abandoned through the Vaccine Mandate.  Many experts in virology and infectious disease would agree that natural immunity is safer and more effective in reducing transmission and reinfection than standard vaccines.  A recent study released by Dr. Camit Cohen, PhD, found that "While the quantity of antibodies decreases with time in both COVID-19

recovered patients and vaccinated individuals, the *quality* of antibodies performance increases following infection but not after vaccination." Consequently, effectiveness largely involves the quality and not quantity of antibodies. Thus, when the CDC releases statements that neutralizing antibodies are increased after COVID-19 vaccinations and boosters, it may have no bearing on infection rates.

90.     Additionally, since the introduction of COVID-19 vaccines to the U.S. market, over 1,000 sailors and support personnel in Navy SEALs 1 through 3 command have been fully vaccinated, leaving only approximately 200 members of the command (and that number is decreasing), including Plaintiffs, unvaccinated. Based on Defendants' claims that the vaccines are efficacious (claims which are undermined by science), this high percentage of command vaccinations further reduces the risks of COVID-19 infection and spread throughout the command thus further ensuring military readiness and health and safety requirements for units and individuals and undermining Defendants' demand that Plaintiffs get vaccinated with the morally compromised vaccines.

91.     The majority of the Navy personnel in Plaintiffs' commands, to include Plaintiffs, do not fall within the demographic of those individuals most likely to succumb to COVID-19. This further highlights the low risk to health and safety and thus military readiness if Plaintiffs do not receive a COVID-19 vaccine. Indeed, the Navy has not lost one SEAL to the COVID-19 pandemic at any of Plaintiffs' commands nor has any SEAL been hospitalized due to COVID-19.

92.     Within the Navy (active duty and reserve), there have been approximately 88,254 confirmed cases of COVID-19, of which 85,005 have recovered, with 3,232 active cases, 2 hospitalized, and 17 fatalities. Thus, the survival rate for Navy personnel is 99.98%; or stated

otherwise, the fatality rate is only 00.02%.  This makes COVID-19 far less a threat to the force than to the civilian sector.

93.     Plaintiffs are aware of no Navy SEAL who has died, let alone been hospitalized, by COVID-19 even though this virus has been with us for nearly two years.  In contrast, Plaintiffs are aware of many Navy SEALs who have died defending our freedoms against a hostile enemy and in training accidents.  Moreover, due to their age and fitness, Plaintiffs belong to the demographic that is most susceptible to adverse consequences from a COVID-19 vaccine.  In short, the potential harm caused by the vaccine outweighs the risk of any Plaintiff contracting COVID-19 and suffering from the virus in any way that undermines their ability to perform their military duties. This is especially true when you consider the fact that the government has no idea what mid- and long-term consequences may arise as a result of a person receiving any one of these experimental vaccines.

94.     Plaintiffs are aware of other Navy SEALs who have had COVID-19, and the symptoms have all been those similar to a weak case of the seasonal flu, with the most common symptom being a loss of smell or taste.  Navy SEALs suffer far more injuries, some of which are disabling, from their routine and rigorous training than anything COVID-19 has caused.

95.     Navy SEALs 2, 3, and 4 each had COVID-19.  Their symptoms were no worse than a very mild case of the seasonal flu.  Navy SEAL 4 had a mild headache for 2 days and lost his sense of smell for about 30 days.  Navy SEALs 2 through 4 now have effective, natural immunity to COVID-19 and its variants.  The fact that Navy SEAL 1 has not been infected to date (or at least has not suffered any severe COVID-like symptoms) indicates that he has natural immunities against COVID-19.

96.    Unit cohesion, and good order and discipline, are not adversely affected by Plaintiffs' vaccination status at their commands.  The medical status of individuals is a private matter that is not to be disclosed to the commands at large.  It is well-established that even individuals who have been fully vaccinated against COVID-19 may still contract and spread the virus.  Individuals who chose to receive a COVID-19 vaccine did so to protect their individual, personal health.  They have put their confidence in the efficacy and effectiveness of the vaccine to protect them from contracting the virus or to help reduce the effects of the virus if contracted.  The vaccination status of co-workers is not an issue within Plaintiffs' commands.

97.    As noted above, long term studies have not been conducted on the COVID-19 injection results for members who jump, dive, run, swim, and are in age ranges that have high risks of myocarditis.

98.    Before mandating vaccines that violate the sincerely held religious beliefs of military personnel, the Department of Defense should study operators with natural immunity and establish a base control group to monitor and study vaccinated and unvaccinated members for long term control.  The Department of Defense has no interest in doing so because the Vaccine Mandate is purely political and not based on science.

99.    There is no compelling governmental interest to enforce the Vaccine Mandate against Plaintiffs or other similarly situated service member.

100.    The decision to impose the Vaccine Mandate was arbitrary and capricious, not based on science, and violates fundamental constitutional and statutory rights.

101.    BUMEDINST 62330.15B provides, *inter alia*, that vaccinations of "detainees" are "voluntary."  It also provides exemptions if there is "[e]vidence of immunity" and based on the "[u]nderlying health condition of the vaccine candidate."

102.    The readiness and fitness of the military force is <u>not</u> enhanced by mandating a vaccine that is experimental, ineffective, and dangerous.

103.    The readiness and fitness of the military force is not advanced by removing Plaintiffs from their special operator status as Navy SEALs and sending them to other fleet billets or discharging them from the military because Plaintiffs object to the Vaccine Mandate based on their sincerely held religious beliefs.

104.    Vaccinations to prevent reinfection of recent or even remote history of any viral infection have never been mandated or even recommended by any health prevention organization.

105.    Normal biology and virology principles are violated when a patient is vaccinated to produce neutralizing antibodies which already exist in the patient.   There would be no physiologic reason to vaccinate anyone with reasonable titers of neutralizing antibodies and thus this would be considered a procedure which is not medically indicated.

106.    Significant evidence exists in recent peer reviewed and published studies showing that re-infection rates of COVID-19 are extremely low and not medically relevant as a community health hazard.

107.    A recent study in Israel concluded that natural infection provided a protection that was 13 times the protection afforded to the vaccinated.

108.    Defendants have no compelling interest to mandate vaccinations for sailors who have natural immunities to COVID-19 as a result of a prior infection.  This includes Plaintiffs.

109.    Now that the wild variant and the Delta variant of COVID-19 are largely extinct and the threat of COVID-19 has dissipated, there is no basis for Defendants to continue enforcing the Vaccine Mandate.  Indeed, just recently, the Commander-in-Chief and members of Congress

removed their masks for the State of the Union Address precisely because COVID-19 posed no threat to their safety.

**F.     Least Restrictive Means.**

110.    Punishing Plaintiffs, separating Plaintiffs from their special warfare duties, and discharging Plaintiffs does not further a compelling government interest nor is it the least restrict means of furthering any such interest.

111.    Least restrictive means such as testing, wearing a mask (which the government claims is an effective way to stop the spread of COVID), social distancing, reporting symptoms and close contacts, and available therapeutics are all less restrictive means of promoting the government's interests without violating Plaintiffs' sincerely held religious beliefs.

112.    During the initial COVID-19 time period, Navy SEAL 3's command (to which Navy SEALs 1 through 3 belong) and specifically his department successfully executed health protection protocols to limit COVID-19 exposure resulting in a higher productivity rate due to a lack of physical distractions.  These protocols included the following: (a) development of standard operating procedures (SOP), new secure digital platforms, and remote training options for commands under his group; (b) teleworking during extreme spikes in COVID-19 cases; (c) implementing a Blue/Gold team to maximize social distancing practices; (d) ensuring personnel were social distancing when they were required to be in the office together; (e) sanitizing building areas and workstations daily; and (f) establishing a protocol whereby if a service member felt ill, he stayed out of work and in constant communication with the medical department until he recovered and could return to service with a negative COVID-19 test.

113.    The protocols that Navy SEAL 3's command, including his department, established over the last two years have led to the permanent assignment of headquarter staff members to

remote or distance work assignments from home using the technology and protocols. Navy SEAL 3 is assigned as a headquarter staff member. Consequently, he can work remotely.

114.    For more than a year, Plaintiffs' commands continued to execute mission requirements during the COVID-19 pandemic without the benefit of a vaccine. This included deploying, training, and conducting operational and non-operational tasks worldwide, with minimum impact due to COVID 19.

115.    Navy SEAL 4's command also instituted COVID-19 safety protocols, including a 14-day quarantine for those infected with the virus, mandatory reporting of symptoms or exposure, mask wearing in gathering places like the chow hall, utilizing the CRAM T (a metric to gauge exposure while on a trip) when approving leave, and weekly testing of the unvaccinated.

116.    During the pandemic, Navy SEALs 1 and 2 and their fellow SEALs traveled multiple times and conducted numerous exercises throughout CONUS (continental United States). COVID-19 had no impact on their operational capabilities.

117.    During the pandemic, Navy SEAL 4 and his fellow SEALs traveled and conducted operations as well as exercises. They travelled outside of CONUS on two occasions, and on six occasions they traveled out of the state for training. COVID-19 had no impact on Navy SEAL 4's operational capabilities or his unit's operational capabilities.

118.    The force health protection protocols established by Plaintiffs' commands are a less restrictive means of furthering the government's interests without infringing upon Plaintiffs' sincerely held religious beliefs.

119.    In a February 4, 2022, notice filed in the U.S. District Court for the Middle District of Florida, the Navy reported receiving 4,095 requests for a religious exemption from COVID-19 vaccination. The Navy had denied 3,728 initial requests—93% of all pending requests—and

granted no initial request.  Of these 3,728 denials, 1,303 sailors appealed.  The Navy denied 81

appeals and granted none.  The Navy reportedly separated 240 sailors who requested a religious

exemption from COVID-19 vaccination.  *Navy Seal 1 v. Austin*, No. 8:21-cv-2429-SDM-TGW,

2022 U.S. Dist. LEXIS 31640, at *15-16 (M.D. Fla. Feb. 18, 2022).

120.    Although the Navy reported to the Florida district court an inability to quantify the

number of requests for, or denials of, a temporary or permanent medical exemption, it nonetheless

reported 252 active temporary medical exemptions, which require renewal every thirty days, and

11 permanent medical exemptions.  The number of active temporary medical exemptions had

fallen since November 10, 2021, when the Navy reported 698 active temporary medical

exemptions.  *Id*.

121.    On March 2, 2022, the Navy provided a COVID-19 update, reporting that 4,629

service members on active duty remain unvaccinated.  There have been 396 Active Component

Sailors and 1 Reserve Component Sailor separated for refusing the COVID-19 vaccine.  There

have been 3,472 religious accommodation requests.  As of March 2, 2022, the Navy has approved

for service members on active duty 12 permanent medical exemptions, 211 temporary medical

exemptions, 39 administrative exemptions, and zero religious exemptions to the Vaccine Mandate.

*See* https://www.navy.mil/US-Navy-COVID-19-Updates/ (last visited Mar. 3, 2022).

## FIRST CLAIM FOR RELIEF

### (Violation of the Religious Freedom Restoration Act)

122.    Plaintiffs hereby incorporate by reference all stated paragraphs as though fully set

forth herein.

123.    The enforcement of the Vaccine Mandate against Plaintiffs and other similarly

situated members of the armed services who object to this mandate on religious grounds, as set

forth in this Complaint, violates the Religious Freedom Restoration Act (42 U.S.C. § 2000bb, et. seq.).

124.   RFRA plainly applies to Defendants, as they constitute a "branch, department, agency, instrumentality, and official of the United States." 42 U.S.C. § 2000bb-2(1).

125.   Plaintiffs' sincerely held religious beliefs prohibit them from complying with the Vaccine Mandate, and Plaintiffs' compliance with these religious beliefs is a religious exercise.

126.   The Vaccine Mandate's requirement that service members such as Plaintiffs receive a morally compromised COVID-19 vaccine or face penalties, including, but not limited to, prosecution and criminal penalties, discharge from the military, removal from special warfare operations, adverse fitness reports, loss of pay and benefits, loss of education and training opportunities, loss of personal decorations and insignia, specifically including the Special Warfare / SEAL Trident insignia, substantially burdens Plaintiffs' sincerely held religious beliefs.

127.   The Vaccine Mandate pressures Plaintiffs to significantly modify their religious behavior by engaging in the immoral act of injecting their body with a morally compromised substance (COVID-19 vaccine) in violation of their sincerely held religious beliefs.

128.   Defendants' enforcement of the Vaccine Mandate against Plaintiffs as set forth in this Complaint substantially pressures Plaintiffs to receive the morally compromised COVID-19 vaccine in violation of Plaintiffs' sincerely held religious beliefs.

129.   Defendants' enforcement of the Vaccine Mandate against Plaintiffs as set forth in this Complaint forces Plaintiffs to violate their personal convictions that the Holy Spirit and Scripture have impressed upon them thus forcing them to sin against God in violation of their sincerely held religious beliefs.

130.    Plaintiffs currently confront an actual and imminent burden on their religious practice and religious exercise.

131.    The enforcement of the Vaccine Mandate, especially as applied to Plaintiffs, does not further any compelling governmental interest.

132.    The enforcement of the Vaccine Mandate, especially as applied to Plaintiffs, is not the least restrictive means to accomplish any permissible governmental interest.

133.    The enforcement of the Vaccine Mandate has caused, and will continue to cause, Plaintiffs to suffer undue hardship, economic injury, and irreparable harm.

134.    Plaintiffs lack an adequate or available administrative remedy.

135.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their legal rights.

136.    Defendants' violation of RFRA as set forth in this Complaint has caused and will continue to cause Plaintiffs to suffer undue hardship and irreparable injury as well as economic damage and damage to their reputations.

## SECOND CLAIM FOR RELIEF

### (Free Exercise — First Amendment)

137.    Plaintiffs hereby incorporate by reference all stated paragraphs set forth herein.

138.    The Vaccine Mandate, on its face and as applied, impermissibly burdens Plaintiffs' sincerely held religious beliefs, compels Plaintiffs to either change those beliefs or act in contradiction to them, and forces Plaintiffs to choose between following their sincerely held religious beliefs or suffering penalties and loss of benefits.

139.    The Vaccine Mandate, on its face and as applied, puts substantial pressure on Plaintiffs to violate their sincerely held religious beliefs or face penalties and loss of benefits.

140.    The Vaccine Mandate, on its face and as applied, is neither neutral nor generally applicable.

141.    The Vaccine Mandate, on its face and as applied, specifically targets Plaintiffs' religious beliefs for disparate and discriminatory treatment.

142.    The Vaccine Mandate, on its face and as applied, creates a system of individualized exemptions for preferred exemption requests while discriminating against requests for exemption and accommodation based on sincerely held religious beliefs.

143.    Defendant's violation of the Free Exercise Clause as set forth in this Complaint has caused and will continue to cause Plaintiffs to suffer undue hardship and irreparable injury as well as economic damage and damage to their reputations.

### THIRD CLAIM FOR RELIEF

### (Equal Protection — Fifth Amendment)

144.    Plaintiffs hereby incorporate by reference all stated paragraphs set forth herein.

145.    By targeting Plaintiffs for adverse treatment because they have asserted their fundamental right to religious freedom guaranteed by the U.S. Constitution, Defendants have deprived Plaintiffs of the equal protection of the law guaranteed under the Fifth Amendment to the United States Constitution.

146.    The Supreme Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment. Consequently, case law interpreting the Equal Protection Clause of the Fourteenth Amendment is applicable when reviewing an equal protection claim arising under the Fifth Amendment's Due Process Clause, as in this case.

147.    Through the enforcement of the Vaccine Mandate, Defendants are targeting Plaintiffs and other similarly situated military members who have religious objections to the COVID-19 vaccines for adverse treatment because of their religious beliefs and convictions in violation of the equal protection guarantee of the Fifth Amendment.

148.    Defendant's discriminatory treatment of Plaintiffs in violation of the equal protection guarantee of the Fifth Amendment has caused and will continue to cause Plaintiffs to suffer undue hardship and irreparable injury as well as economic damage and damage to their reputations.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment as follows:

A.    That this Court declare that the enforcement of the Vaccine Mandate as set forth in this Complaint violates the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb-4;

B.    That this Court declare that the enforcement of the Vaccine Mandate as set forth in this Complaint violates the First Amendment to the United States Constitution;

C.    That this Court declare that the enforcement of the Vaccine Mandate as set forth in this Complaint violates the Fifth Amendment to the United States Constitution;

D.    That this Court preliminarily and permanently enjoin the enforcement of the Vaccine Mandate and any and all adverse consequences Defendants have imposed, or intend to impose, upon Plaintiffs for failing to comply with this mandate as set forth in this Complaint;

E.    That this Court order that Plaintiffs' status as U.S. Navy SEALs be restored to the status Plaintiffs enjoyed prior to the enforcement of the Vaccine Mandate, including the restoration of any and all pay, promotions, awards, decorations, insignias, specifically including the Special

Warfare / SEAL Trident insignia, and other benefits lost as a result of Defendants' enforcement of the Vaccine Mandate as set forth in this Complaint;

F.      That this Court order Defendants to expunge any and all adverse fitness reports or other adverse official records or entries in any official record of Plaintiffs on account of Plaintiffs' objection to the Vaccine Mandate as set forth in this Complaint;

G.      That Defendant Gilday, in his individual capacity, pay compensatory damages to Plaintiffs for the financial harm caused by his actions;

H.      That this Court award Plaintiffs their reasonable costs, including attorney's fees, pursuant to 5 U.S.C. § 504, 28 U.S.C. § 1920, 28 U.S.C. § 2412, 42 U.S.C. § 2000bb-1, 42 U.S.C. § 1988, and the general legal and equitable powers of this Court;

I.      That this Court grant such other and further relief as it deems equitable and just under the circumstances.

Respectfully submitted,

**AMERICAN FREEDOM LAW CENTER**

/s/ *Robert J. Muise*
Robert J. Muise, Esq. (D.C. Court Bar No. MI 0052)
P.O. Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756
rmuise@americanfreedomlawcenter.org

/s/ *David Yerushalmi*
David Yerushalmi, Esq. (DC Bar No. 978179)
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20001
dyerushalmi@americanfreedomlawcenter.org
(646) 262-0500

*Counsel for Plaintiffs*